UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Medmarc Casualty Insurance Company,

        Plaintiff,

v.                                                      Civil No. 07-4034 (JNE/JJK)
                                                      ORDER

St. Jude Medical, Inc.; Pacesetter, Inc.;
St. Jude Medical, Atrial Fibrillation
Division, Inc.; and St. Jude Medical,
Cardiology Division, Inc.,

        Defendants.

Jarvis C. Jones, Esq., and Britton D. Weimer, Esq., Jones Satre & Weimer, PLLC, appeared for Plaintiff Medmarc Casualty Insurance Company.

Thomas C. Mielenhausen, Esq., and Christopher L. Lynch, Esq., Lindquist & Vennum P.L.L.P., appeared for Defendants St. Jude Medical, Inc.; Pacesetter, Inc.; St. Jude Medical, Atrial Fibrillation Division, Inc.; and St. Jude Medical, Cardiology Division, Inc.

      This is an insurance coverage dispute. An insurer, Medmarc Casualty Insurance Company (Medmarc), seeks a declaration that it has no duty to defend or indemnify its insureds against certain products-liability claims. The insureds counterclaim for a declaration that Medmarc has a duty to defend and indemnify them. They also claim that Medmarc breached those duties. The case is before the Court on cross-motions for partial summary judgment. St. Jude Medical and its subsidiaries also move to strike an affidavit. For the reasons set forth below, the Court grants partial summary judgment in favor of St. Jude Medical, Inc., and its subsidiaries. The Court denies the motion to strike.

## I.    BACKGROUND

      St. Jude Medical, Inc., and its subsidiaries develop, manufacture, and distribute pacemakers and other cardiovascular medical devices. Medmarc insured St. Jude Medical and

its subsidiaries from 1996 to 2002.  In the motions before the Court, the parties limit their arguments to two class actions brought against one of St. Jude Medical's subsidiaries—Pacesetter, Inc., doing business as St. Jude Medical, Cardiac Rhythm Management Division (CRMD)—and its Australian distributor, Medtel Pty Limited (Medtel), in Australia.

In June 2000, CRMD and Medtel issued Hazard Alerts in Australia in consultation with the Australia Therapeutic Goods Administration (TGA).  One alert notified physicians that premature battery depletion had been observed in certain Tempo pacemakers.  The other alert advised physicians of an increased risk of failure of pacer processing integrated circuits in certain Meta 1256 pacemakers.  The alerts recommended that physicians strongly consider replacing the Tempo or Meta 1256 pacemakers on a prophylactic basis for all patients who are significantly pacemaker dependent.  In July 2000, CRMD extended the Meta 1256 alert.

On June 22, 2000, a class action was brought against St. Jude Medical and Medtel in the Federal Court of Australia by Karel Klijnsma on behalf of all persons in Australia who had a Tempo pacemaker implanted and who required, or had had, surgical replacement of the pacemaker or other medical care or monitoring because of a defect or potential defect in the pacemaker.  In its Statement of Claim, the class asserted violations of the Australia Trade Practices Act; alleged that "[t]he pacemakers are defective and/or unsafe because of their propensity to suffer from premature battery depletion and their safety is not such as persons generally are entitled to expect"; and claimed damages, including "personal injury . . . arising out of further hospitalisation and surgery" in the case of individuals requiring replacement of the pacemakers, as a result of the pacemakers' defective nature.  Later, Kevin Courtney became the class representative, CRMD was joined as a defendant, and St. Jude Medical was removed as a party.  The law firm of Clayton Utz represented CRMD and Medtel in the *Courtney* action.

In June 2001, a class action was brought against CRMD and Medtel in the Federal Court of Australia by Patrick Darcy on behalf of all persons who had a Meta 1256 pacemaker implanted in Australia, where the pacemaker was subject to the June and July 2000 alerts or would have been had the pacemaker not already been explanted. In its Statement of Claim, the *Darcy* class asserted violations of the Australia Trade Practices Act; alleged that the pacemakers "were prone to an increased risk of failure of the pacer processing integrated circuit that controls the pulse generator, resulting or likely to result in sensing and output anomalies, including failure of the device"; and claimed damages, including "personal injury . . . arising out of further hospitalisation and surgery" in the case of individuals requiring replacement of the pacemakers, as a result of the pacemakers' defective nature. As in the *Courtney* action, the law firm of Clayton Utz represented CRMD and Medtel in the *Darcy* action.

Courtney's claims under certain sections of the Australia Trade Practices Act against Medtel were tried before the Federal Court of Australia in October 2002. In February 2003, the Federal Court of Australia concluded that Courtney's "Pacemaker was not of merchantable quality at the time of implantation" for reasons summarized by the court as follows:

- the purpose for which pacemakers are commonly bought is to enable them to be implanted, on the advice of doctors, into patients experiencing electrical heart related problems in order to restore regular heart beat by means of electrical impulses to the heart;

- [Courtney's] Pacemaker was manufactured using yellow spool solder and was therefore affected by white residue which acted as a trap or attraction for ionic contaminants;

- the Pacemaker was therefore subject at the time of implantation to a risk of premature failure over and above the background or random risk affecting all pacemakers;

- this superadded risk related to premature battery depletion caused by dendritic growth which, in turn, was the product of ionic contamination attracted or trapped by the white residue interacting with ever present electrical bias and moisture;

3

- a reasonable person in the position of [Courtney] (or other remaining group members similarly placed) would not expect his or her Pacemaker to have been manufactured in such a way as to be subject to a superadded risk of premature failure (that is, a superadded risk that it will be unable to fulfill the purpose of restoring and maintaining the heart rate of patients experiencing electrical heart-related problems);

- accordingly, [Courtney's] Pacemaker was not of merchantable quality for the purposes of [the Australia Trade Practices Act].

The court also concluded that Courtney had experienced loss or damage by reason of the fact that his pacemaker was not of merchantable quality:

> Given that [Courtney's] Pacemaker was not of merchantable quality, he clearly suffered at least some loss or damage by reason of that fact. The Pacemaker was explanted on Professor Black's recommendation. That recommendation was made in the aftermath of the Hazard Alert because of concerns about the health consequences for [Courtney] of premature failure of the device. Professor Black's recommendation and [Courtney's] acceptance of that recommendation were reasonable responses to the Hazard Alert and to the increased risk that [Courtney's] Pacemaker would fail. The explantation of the Pacemaker and any loss or damage suffered by [Courtney] as a result of the explantation were plainly caused by the device's lack of merchantable quality.

The court awarded Courtney AU$68.20 for past economic loss; AU$7,500 for pain, suffering, and loss of enjoyment of life; and AU$2,420 for past gratuitous care services provided by Courtney's wife. The court declined to award Courtney any damages for anxiety, worry, and stress.

Before the Federal Court of Australia issued its decision in February 2003, several members of the *Courtney* class and one member of the *Darcy* class settled their claims against CRMD and Medtel. After the February 2003 decision, CRMD and Medtel reached settlements with the remaining members of the *Courtney* and *Darcy* classes. In approving the *Courtney* settlement, the Federal Court of Australia noted that the proposed settlement had "been formulated in the light of the findings and the award of compensation made to Mr. Courtney." In

4

approving the *Darcy* settlement, the court remarked that "the issues in substance are identical to those that [the court has] dealt with in [*Courtney*]."

St. Jude Medical notified Medmarc of the Tempo and Meta 1256 advisories, as well as the action brought by Klijnsma. Medmarc indicated that it would not cover claims brought by individuals who had surgery to replace their pacemakers based on the advisories instead of pre-surgery bodily injury or product malfunction. St. Jude Medical objected, but Medmarc did not alter its position. A similar exchange took place between St. Jude Medical and Medmarc with regard to the claim brought by Darcy.

Throughout the *Courtney* and *Darcy* actions, Clayton Utz provided updates to Medmarc. Medmarc neither consented nor objected to the settlements of the actions in light of its coverage position.

In July 2006, St. Jude Medical asked Medmarc for reimbursement of St. Jude Medical's damages and defense costs incurred in excess of St. Jude Medical's self-insured retention in *Courtney*, *Darcy*, and other actions. St. Jude Medical asserts that it is not seeking coverage for settlements made with class members whose pacemakers remained in situ. After conducting an investigation, Medmarc denied coverage and brought this action. The parties now move for partial summary judgment.

## II. DISCUSSION

### A. Motions for partial summary judgment

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify

5

"those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The parties essentially agree that there are no genuine issues of material fact. They also agree that Minnesota law applies. Under Minnesota law, "[i]nterpretation of an insurance policy is a question of law." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). Unambiguous language receives its plain and ordinary meaning; ambiguous language is construed against the insurer. *Id.* "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Id.* "In typical liability insurance contracts, the insurer has an obligation to indemnify an insured for covered claims and, if a 'claim is not clearly outside coverage, the insurer has a duty to defend.'" *Haarstad v. Graff*, 517 N.W.2d 582, 584 (Minn. 1994) (quoting *Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 390 (Minn. 1979)); *see Wooddale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d 283, 284-85 (Minn. 2006) (noting that duty to defend is broader than duty to indemnify); *Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 529 (Minn. 2003) ("A duty to defend an insured arises if any part of the claim is *arguably* within the scope of the policy's coverage, and the burden is on the insurer to prove that a claim clearly falls outside the coverage."). "To determine whether a duty [to defend] exists, the allegations in the

...

underlying complaint and the surrounding facts will be compared with the relevant language in the insurance policy." *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 576 (Minn. 2009).

The parties agree any coverage for the *Courtney* and *Darcy* actions would be provided by the policy in effect from January 31, 2000, to January 31, 2001. The parties dispute whether the *Courtney* and *Darcy* actions satisfy that policy's conditions of coverage and whether certain exclusions apply.

The policy provides:

> a. We [Medmarc] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" included within the "products-completed operations hazard" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" . . . .

With exceptions not relevant here, the policy defines "products-completed operations hazard" to include "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"

*Bodily injury*

The parties first dispute whether the claimants in the *Courtney* and *Darcy* actions sustained bodily injuries. Medmarc maintains that no bodily injuries were sustained because the pacemakers were explanted prophylactically. St. Jude Medical and its subsidiaries contend that the claimants in the *Courtney* and *Darcy* actions alleged and ultimately recovered damages due to bodily injury.

7

The policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." The claimants in the *Courtney* and *Darcy* actions sought damages due to personal injury arising out of hospitalizations and surgeries. The Federal Court of Australia awarded damages to Courtney for pain and suffering based on soreness, swelling, bruising, and scarring, as well as his inability to raise his arms for approximately six weeks after the explantation. Later, the Federal Court of Australia approved the settlements of the *Courtney* and *Darcy* actions based in part on its findings with regard to Courtney. In light of the claim for damages in the *Courtney* and *Darcy* actions, the award of damages to Courtney for pain and suffering, and the approval of the settlements of the *Courtney* and *Darcy* actions based on the award to Courtney, the Court concludes that damages alleged and recovered in the *Courtney* and *Darcy* actions were based in part on bodily injury.

*Arising out of*

The parties next dispute whether the bodily injuries arose out of St. Jude Medical's product. Medmarc contends that St. Jude Medical's pacemakers did not create any bodily injury. Instead, Medmarc argues, St. Jude Medical's "'business risk' decision to prophylactically explant its pacemakers" caused bodily injury. St. Jude Medical and its subsidiaries maintain that the bodily injuries experienced by the claimants in the *Courtney* and *Darcy* actions arose out of the pacemakers' failure to be of merchantable quality and fit for their intended purpose.

As noted above, the policy defines "products-completed operations hazard" to include "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'" It is undisputed that the Tempo and Meta 1256 pacemakers at issue in the *Courtney* and *Darcy* actions fall within the definition of "your

product."[1] The Court turns, then, to whether the bodily injuries experienced by claimants in the *Courtney* and *Darcy* actions arose out of the pacemakers.

Under Minnesota law, "[t]he phrase 'arising out of' is broadly construed." *Dougherty v. State Farm Mut. Ins. Co.*, 699 N.W.2d 741, 744 (Minn. 2005). "The term 'arising out of' requires only a causal connection; it does not require proximate cause." *Kabanuk Diversified Invs., Inc. v. Credit Gen. Ins. Co.*, 553 N.W.2d 65, 72 (Minn. Ct. App. 1996); *Ross v. City of Minneapolis*, 408 N.W.2d 910, 912 (Minn. Ct. App. 1987). "'Arising out of' generally means 'originating from,' 'growing out of,' or 'flowing from.'" *Dougherty*, 699 N.W.2d at 744.

In the *Courtney* and *Darcy* actions, the classes alleged that St. Jude Medical and its subsidiaries represented the pacemakers were reasonably fit for their intended purpose and of merchantable quality; that the pacemakers were not reasonably fit for their intended purpose; that

---

[1] The policy's definition of "your product" is:

"Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

9

the pacemakers were not of merchantable quality; and that the class members sustained damages, including personal injury arising out of further hospitalization and surgery, due to the pacemakers' defective nature. The Federal Court of Australia found that "[t]he explantation of the Pacemaker and any loss or damage suffered by [Courtney] as a result of the explantation were plainly caused by the device's lack of merchantable quality"; that Courtney's pacemaker was not reasonably fit for its intended purpose; and that Courtney was entitled to recover damages due to his pacemaker's lack of merchantable quality and of fitness for its intended purpose. Later, the Federal Court of Australia approved the settlements of the *Courtney* and *Darcy* actions based on its findings with regard to Courtney. Accordingly, the Court concludes that the bodily injuries experienced by the claimants in the *Courtney* and *Darcy* actions arose out "your product" as defined in the policy.

*Occurrence*

As noted above, the policy applies only to bodily injury caused by an occurrence. St. Jude Medical and its subsidiaries maintain that an occurrence caused the bodily injuries sustained by members of the *Courtney* and *Darcy* classes. Medmarc contends that any bodily injuries sustained by members of the *Courtney* and *Darcy* classes were not caused by an occurrence but by St. Jude Medical's decision to prophylactically explant pacemakers.

The policy defines "occurrence" as:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> As regards, "Products-completed operations hazard" and with respect to "bodily injury" or "property damage," the date of "occurrence" is deemed to be the earlier date of:
>
> a. a claim is made or "suit" is brought alleging injury or damage resulting from your product;

  b. a professional medical opinion is rendered which provides a basis for a claim or "suit" under the coverage provided;

  c. medical expenses are incurred as a result of injury or damage;

  d. death occurs from exposure to your product;

  e. removal or replacement of an implantable product;

  f. an accident involving your product which leads to a demand for a recovery of damages[;]

  g. the date of the advisory memorandum initiated by you. An "advisory memorandum" is any communication issued by you to inform health professionals or other appropriate persons or firms of a risk of substantial harm from a product in commercial use.

An endorsement to the policy contains the following amendment to the definition of "occurrence":

BATCH CLAUSE

  Section VI – DEFINITIONS, the term "occurrence" with respect to "products-completed operations hazard" is amended to include the following:

  The term "batch" means all products which have the same known or suspected defect or deficiency which is identified by the same advisory memorandum.

  The term "advisory memorandum" is any communication issued by you to inform health professionals or other appropriate persons or firms of a risk of "bodily injury" or "property damage" from a product in use.

  Coverage does not apply to any loss, claim or "suit" which arises out of a defect or deficiency which was known or suspected prior to the retroactive date shown in this policy.

  When this endorsement is attached to your policy, all losses arising from a single "batch" of your product will be considered to be one "occurrence." Therefore, when multiple losses are considered to be one "occurrence" you must only meet a single "self insured retention" amount. Likewise, our limit of liability due to "bodily injury" and "property damage" is limited to that of a single "occurrence."

  All claims made by persons or organizations seeking damages because of "bodily injury" or "property damage" arising out of one batch will be deemed to have been made at the time the first of those claims is made against you.

11

Since the policy does not define "accident," the term means "an unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause." *Hauenstein v. Saint Paul-Mercury Indem. Co.*, 65 N.W.2d 122, 126 (Minn. 1954); *see Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609-11 (Minn. 2001). Relying on *In re Silicone Breast Implant Insurance Coverage Litigation*, 652 N.W.2d 46 (Minn. Ct. App. 2002), *aff'd in part and rev'd in part*, 667 N.W.2d 405 (Minn. 2003), Medmarc instead contends that an occurrence does not take place when an insured's suspected defective product was manufactured, implanted, or explanted, and that an occurrence is an accident, event, or happening which results, during the policy period, in bodily injury that is neither expected nor intended by the insured and that an occurrence takes place not when the insured engages in the wrongful act but when the complaining party was actually damaged. *See* 652 N.W.2d at 57. Because St. Jude Medical and its subsidiaries encouraged prophylactic explants of the pacemakers, Medmarc argues, the scarring and bruising from the explants was expected and intended by St. Jude Medical and its subsidiaries. The portion of *In re Silicone* on which Medmarc relies discusses how occurrence policies are triggered. *Id.*; *cf. In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 415 n.3 (Minn. 2003) (quoting policy's definition of "occurrence" as "an accident, event or happening, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured"). The policy at issue in this case is essentially a claims-made policy. *See Cargill, Inc. v. Evanston Ins. Co.*, 642 N.W.2d 80, 86 n.3 (Minn. Ct. App. 2002). Because different definitions of "occurrence" are present in the policy at issue in *In re Silicone* and the policy at issue in this case, the Court does not find Medmarc's reliance on *In re Silicone* persuasive. *Cf. Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co.*, 993 F. Supp. 1248, 1254 (D. Minn.

1998) ("Under a claims-made policy, it does not matter when the act occurred. An occurrence policy is a policy which provides coverage if the insured conduct occurred within the term of the policy, even if the term has since expired." (citation and quotation marks omitted)), *aff'd*, 187 F.3d 871 (8th Cir. 1999).

Having determined that the policy defines "occurrence" to mean an "accident" and that an accident is an unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause, the Court considers whether the bodily injuries experienced by members of the *Courtney* and *Darcy* classes were caused by an occurrence. In the *Courtney* and *Darcy* actions, the classes alleged that the pacemakers were subject to a circuitry problem that resulted or was likely to result in accelerated battery depletion and consequential failure of the device without warning. The classes claimed that the pacemakers' defective nature damaged them. The Federal Court of Australia concluded that Courtney had "succeeded in his claim that his Pacemaker was not of merchantable quality because of a particular element introduced into the manufacturing process by the manufacturer, albeit unwittingly, that materially increased the risk that the product would fail prematurely." For the same reasons, the court concluded that Courtney's pacemaker was not reasonably fit for its intended purpose. Later, the Federal Court of Australia approved the settlements of the *Courtney* and *Darcy* actions based on its findings with regard to Courtney. Thus, the unwitting manufacture of defective pacemakers caused the bodily injuries experienced by the members of the *Courtney* and *Darcy* classes. The Court concludes that the bodily injuries were caused by an occurrence within the meaning of the policy.

*Expected or intended injury*

Medmarc asserts that the policy's exclusion for expected or intended injury defeats coverage. The exclusion provides that the insurance does not apply to "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured. This exclusion does not apply to 'bodily injury' resulting from the use of reasonable force to protect persons or property." The unwitting manufacture of defective pacemakers caused the bodily injuries sustained by the members of the *Courtney* and *Darcy* classes. St. Jude Medical and its subsidiaries did not intend to injure the class members by manufacturing pacemakers that were not of merchantable quality or reasonably fit for their intended purpose. *See Walser*, 628 N.W.2d at 613. In addition, the exclusion does not apply to the use of reasonable force to protect persons. Here, the explantations took place to protect persons from heart attacks. Accordingly, the Court concludes that this exclusion does not apply.

*Your product*

Medmarc contends that coverage for the *Courtney* and *Darcy* classes is excluded pursuant to the policy's exclusion for damages to "Your product." The policy provides that the insurance does not apply to "'[p]roperty damage' to 'your product' arising out of it or any part of it." The policy's definition of "property damage" is:

> "Property damage" means:
>
> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Here, the *Courtney* and *Darcy* classes sought and recovered damages due to bodily injury not property damage. Accordingly, the Court concludes that the policy's exclusion of "property damage to your product" does not defeat coverage.

*Product recall*

Medmarc asserts that the policy's exclusion of product-recall expenses applies to the *Courtney* and *Darcy* actions. Under that exclusion, the policy does not apply to:

> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> (1) "Your product";
>
> (2) "Your work"; or
>
> (3) "Impaired property";
>
> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

In this case, St. Jude Medical and its subsidiaries do not seek coverage for any loss, cost, or expense incurred for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of the pacemakers. Instead, St. Jude Medical and its subsidiaries are seeking coverage for damages paid to individuals who sustained bodily injuries due to the pacemakers' failure to be of merchantable quality and reasonably fit for their intended purpose. Accordingly, the Court concludes that this exclusion does not apply.

*Tender of defense*

Under the policy, Medmarc's right and duty to defend does not begin until the exhaustion of the applicable limit of the self-insured retention by loss reserves or by payments of judgments, settlements, or defense expenses. Upon receipt of a claim, St. Jude Medical must notify Medmarc as soon as practicable. Medmarc contends that it had no duty to defend St. Jude

Medical and its subsidiaries in the *Courtney* and *Darcy* actions because St. Jude Medical and its subsidiaries never made a tender of defense to Medmarc.

"Before an insurer's duty to defend is triggered, 'the formal tender of a defense request is a condition precedent to the recovery of attorney fees that a party incurs defending claims that a third party is contractually obligated to pay.'" *Home Ins.*, 658 N.W.2d at 531 (quoting *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 316 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009)). An insured need not expressly request a defense in order to trigger the insurer's duty to defend. *Id.* at 532-33. "Once notice is given, even without an express request for a defense, it should be the responsibility of the insurer to contact the insured to determine whether the insurer's assistance in the suit is required." *Id.* at 533. "[O]nce an insured provides its primary or umbrella insurer with notice of a suit and opportunity to defend, it has tendered the defense as required by *SCSC Corporation*." *Id.* at 534.

In this case, St. Jude Medical notified Medmarc of the Hazard Alerts regarding the Tempo and Meta 1256 pacemakers and of the *Courtney* and *Darcy* actions. Throughout the *Courtney* and *Darcy* actions, Medmarc received updates from Clayton Utz, the defense counsel retained by St. Jude Medical. Medmarc neither consented nor objected to the settlements of the actions in light of its coverage position. Under these circumstances, the Court concludes that St. Jude Medical and its subsidiaries made a tender of defense to Medmarc. *See id.* at 531, 534.

*Payment documentation*

The policy contains a per occurrence self-insured retention of $3 million and an aggregate self-insured retention of $5 million. As noted above, Medmarc's right and duty to defend does not begin until the exhaustion of the applicable limit of the self-insured retention by

16

loss reserves or by payments of judgments, settlements, or defense expenses. Medmarc contends it has no duty to defend or indemnify based on the policy's provisions regarding documentation of payments toward the self-insured retention. The provision on which Medmarc relies provides:

> Your Obligations under the Self-Insured Retention are:
>
> a. With regard to any sums you pay toward your Self-Insured Retention (SIR), you must provide us with the following:
>
> > (1) copies of any bills paid, and
> >
> > (2) copies of the check/draft in payments[.]
>
> You must provide us with such documentation within ninety (90) days of the date such expenses are paid. We will credit toward your SIR all reasonable sums paid by you. However, we will not credit toward your SIR any payment evidence submitted more than ninety (90) days from the date such payment was issued.

Medmarc contends that St. Jude Medical and its subsidiaries failed to timely submit documentation of payments made toward the self-insured retention. St. Jude Medical and its subsidiaries contend that Medmarc cannot assert their alleged failure to timely submit payment documentation.

After receiving notice of the Hazard Alerts regarding the Tempo and Meta 1256 pacemakers, Medmarc took the position that the policy did not cover "prophylactic" explants. Given its coverage position, Medmarc consistently refused to credit payments arising out of "prophylactic" explants toward the self-insured retention. Medmarc also declined to consent or object to the settlements of the *Courtney* and *Darcy* actions given its coverage position. Under these circumstances, the Court concludes that Medmarc cannot rely on St. Jude Medical and its subsidiaries' alleged failure to comply with the policy's requirement to document payments within ninety days. *See Home Ins.*, 658 N.W.2d at 534.

**B.     Motion to strike**

St. Jude Medical and its subsidiaries move to strike an affidavit submitted by Medmarc. The Court denies the motion without prejudice to St. Jude Medical and its subsidiaries' ability to make an appropriate motion in limine.

### III.    CONCLUSION

In short, the record reveals that Medmarc's policy provides coverage to St. Jude Medical and its subsidiaries for the *Courtney* and *Darcy* actions. The asserted exclusions do not apply. Medmarc breached its duties to defend and indemnify St. Jude Medical and its subsidiaries in the *Courtney* and *Darcy* actions. St. Jude Medical and its subsidiaries ask the Court to issue a money judgment at this time in the amount of almost $3 million. They represent that this sum is the amount by which their defense costs in *Courtney* and *Darcy* and the settlements paid to members of the *Courtney* and *Darcy* actions who had explant surgery exceed the policy's aggregate self-insured retention. Since this Order does not resolve all claims between the parties, a judgment shall not issue at this time. *See* Fed. R. Civ. P. 54(b).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Medmarc's motion for partial summary judgment [Docket No. 72] is DENIED.

2. St. Jude Medical and its subsidiaries' motion for partial summary judgment [Docket No. 78] is GRANTED.

3. St. Jude Medical and its subsidiaries' motion to strike [Docket No. 100] is DENIED.

4. Medmarc is liable for breaching its duties to defend and indemnify in the *Courtney* and *Darcy* actions.

Dated: September 28, 2009

                                                          s/ Joan N. Ericksen
                                                          JOAN N. ERICKSEN
                                                          United States District Judge